OPINION
Roger David Brickles appeals from his conviction for Interference with Custody in violation of R.C. 2919.23(A)(1) of the Ohio Revised Code. Brickles was convicted after a bench trial in the First District Court of Montgomery County. Brickles argues that the criminal statute was not intended to apply to parents like him who have been granted visitation rights. He also argues that his conviction was against the manifest weight of the evidence, particularly on the element of mens rea.
 I.
The following facts are not in dispute. Roger David Brickles married Michelle Brickles in November, 1993. On April 23, 1993, prior to the marriage, a daughter, Tessa, was born to the couple. The parties were granted a final judgment and decree of divorce in the Montgomery County Common Pleas Court, Domestic Relations Division, on May 27, 1997. On November 19, 1997, that court awarded Michelle sole custody of Tessa.
Pursuant to the Domestic Relations Court Order of November 19, 1997, Roger Brickles was granted a Standard Order of Visitation. Under that order, Roger was granted visitation rights on alternate weekends, from Friday at 6:00 p.m. to Sunday at 6:00 p.m. He was also granted visitation on Wednesday evenings, certain holidays, and Tessa's birthdays in odd numbered years. In addition, Roger Brickles was allowed visitation for five weeks each summer, in seven to fourteen day increments. Pursuant to the summer vacation provision, Roger was required to give written notice to Michelle of his summer vacation requests between March 1 and April 1 of each year. If he failed to give notice during the month of March, Michelle was to have priority over summer vacation scheduling. Apparently, the divorce was a bitter one, and the domestic relations court's order required Roger Brickles remain in his car whenever he was dropping Tessa off or picking her up. Similarly, Michelle Brickles was required to stay inside of her house.
On Friday, April 17, 1997, pursuant to the Standard Visitation Order, Roger Brickles picked up his daughter at 5:50 p.m at Michelle's parents' house. Roger did not return Tessa at 6:00 p.m. on Sunday, April 19, 1997, as required by the visitation order. Michelle had to be at work at 6:00 p.m. on Sunday. Thus, she had hired a babysitter to be at the house when Tessa's father brought her home. When Tessa did not return at the appointed time, the babysitter called Michelle, who instructed her to report the event to the police.
When Michelle Brickles left work at 9:05 p.m., she went directly to the Perry Township Police Department and proceeded to file a statement. Chief Bowman of the Perry Township Police Department then phoned Roger Brickles and warned him that, if he did not return Tessa to her mother, he would face an Interference with Custody Charge. Mr. Brickles refused, telling the police chief that he had provided Michelle with notice that he intended to exercise his summer visitation rights beginning in April. Because Roger Brickles refused to return his daughter, Chief Bowman had a criminal complaint prepared.
Later that evening, about 11:00 p.m., Michelle Brickles accompanied Officer Hesler of the Perry Township police to Roger's Residence. There, they met two City of Clayton police officers. The officers asked to see Michelle's custody papers, which she brought with her. Roger refused to deliver Tessa to Michelle because he believed that, pursuant to a notice he had delivered to Michelle Brickles in March, the week of April 17 was supposed to be one of his summer visitation weeks. Brickles showed police a photocopy of a letter that his girlfriend had written, showing one week in each month from April to August as "Tessa's 5 weeks for Summer." He told them that he had delivered the original of this note to Michelle Brickles in late March. Police then served Mr. Brickles with the complaint alleging Interference with Custody.
The case against Roger Brickles went to trial on September 1, 1998 in the First District Court of Montgomery County, Criminal Division. On the witness stand, Michelle Brickles testified that, when Roger came to pick up his daughter on Friday, April 17, she told him that she would see him at 6:00 on Sunday, to which he made no reply. On cross-examination, however, she was forced to recant that testimony. In an earlier statement to police as a complaining witness, Michelle had reported that Roger Brickles dropped Tessa off at her maternal grandmother's house on Friday, and she was not present at the time. Thus, when questioned about her previous statement, Michelle Brickles had to admit that she had no such conversation with Roger on Friday, April 17.
The chief dispute in testimony at trial arose over the letter designating five weeks in successive months as Roger Brickles' summer custody periods. Michelle Brickles testified that she had never received any notice from Roger about when he would exercise his summer visitation. She stated that she did not see the note until police showed it to her at his house, late Sunday night.
Testimony of two defense witnesses contradicted that of Michelle Brickles. Tina Brickles, Roger's wife at the time of the trial and girlfriend in April of 1998, testified that she wrote the note in the middle of March. She said that she and Roger made photocopies of the note, mailed one copy to Michelle, delivered one copy to her mail box, and kept one copy. Tina Brickles' uncle, George Rick Marlow, testified that he accompanied Roger Brickles when the latter placed a copy of the note in Michelle Brickles' mail box.
Tina Brickles also testified that, on one occasion, Michelle came outside of the house while Roger was returning Tessa. While in the car, she overheard a conversation in which Roger asked Michelle if she had any problems with the summer vacation schedule he sent her. According to Tina's testimony, Michelle replied that there were no problems.
Immediately upon the closing of the defense case, the trial court found Roger Brickles guilty of Interference with Custody under R.C. 2919.23(A)(1). The court sentenced him to serve ninety days in jail and a fine of one-thousand dollars. The court then suspended the jail sentence and nine-hundred dollars of the fine, placing Brickles on probation for a term not to exceed two years.
He now appeals from his conviction.
 II.
Brickles asserts a single assignment of error, which is as follows:
 ROGER BRICKLES' CONVICTION OF INTERFERENCE WITH CUSTODY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Brickles raises two distinct arguments in support of this assignment of error. First he argues that R.C. 2919.23, the interference with custody statute, should not apply to the acts of parents who have visitation rights, because the proper remedy for such custody struggles is a contempt citation in the domestic relations court. His second argument is that his conviction was against the weight of evidence on the element of mens rea. We will consider each argument separately.
 A
R.C. 2919.23 provides, in relevant part:
 (A) No person, knowing the person is without privilege to do so or being reckless in that regard, shall entice, take, keep, or harbor a person identified in division (A)(1), (2), or (3) of this section from the parent, guardian, or custodian of the person identified in division (A)(1), (2), or (3) of this section:
(1) A child under the age of eighteen, or a mentally or physically handicapped child under the age of twenty-one;
(2) A person committed by law to an institution for delinquent, unruly, neglected, abused, or dependent children;
(3) A person committed by law to an institution for the mentally ill or mentally retarded.
 Brickles was charged with violation of Section (A)(1) because he kept his minor child from her mother when he was without privilege to do so, because the Standard Order of Visitation did not give him extended visitation rights in April.
Brickles claims, however, that the criminal statute was never intended to apply to a parent with visitation rights, like him, who keeps his child for a time in excess of the rights stated in the visitation order. He argues that a contempt proceeding is the proper vehicle for considering such violations of a visitation order.
Several courts have expressed the concern that problems involving visitation orders are better resolved through a contempt action in the domestic relations court rather than a criminal prosecution under R.C. 2919.23(A)(1) or like statutes. For example, in the case of City of Brecksville v. Kurincic (Dec. 10, 1998), Cuyahoga App. No. 73396, unreported, the trial court dismissed criminal charges against a father under 2919.23(A) because the court found it inappropriate to consider such disputes in the context of a criminal trial.
Kurincic involved a father who tried to keep his daughter overnight on her birthday in violation of a visitation order that required him to return her by 4:00 p.m. Id. at 1. He was then charged with Interference with Custody under R.C. 2919.23(A)(1). The trial court dismissed the case, writing:
 On due consideration of Defendant's motion to dismiss the Court finds probable cause for the issuance of the complaint herein and the arrest of Defendant. However on the facts presented herein by motion and brief with exhibits the Court finds judicial economy dictates that this matter be decided at the Domestic Relations Proceeding. Said Court has personal knowledge of the facts herein, together with jurisdiction [sic] over all the parties necessary to a complete and final disposition [sic] of the issues involved and to enforce and interpret its' [sic] own orders. Accordingly, Defendant's motion to dismiss is granted. Defendant is hereby discharged and costs are suspended.
 Id. at 2. Prosecutors did not appeal the dismissal, and the father's appeal of the probable cause determination was dismissed by the court of appeals as moot. Id. at 3. The trial court's decision to dismiss in Kurincic, therefore, has little precedential value in regard to decision today. Nevertheless, that court's decision was based on a concern that a criminal-law approach to such matters is inappropriate, and that same concern has been expressed elsewhere.
In State v. Wengatz (1984), 14 Ohio App.3d 316, the Eleventh Appellate District reversed a mother's conviction for Child Stealing in violation of R.C. 2905.04 (since repealed). Id. at 317-318. The mother was a non-custodial parent with visitation rights. Id. at 316. One day, she picked her two daughters up from school and took them to Disney World, apparently in violation of the visitation order. Id. As a consequence she was charged with Child Stealing. The Eleventh District Court reversed the conviction finding "no evidence of criminal conduct or intent." The court then added the following:
 It is suggested that a more appropriate method of handling the father's complaint would have been by a contempt proceeding in domestic relations court. To put a mother in jail for two years for giving her children a vacation is a gross miscarriage of justice and totally senseless.
 Id. at 317-318.
Our court has noted that the availability of the domestic relations court, and its superior position for handling violation and enforcement of visitation orders, probably underlay the General Assembly's decision to deny a right of a civil action to one parent based on the other's violation of R.C. 2919.23. SeeBrown v. Denny (1991), 72 Ohio App.3d 417, 421. R.C. 2307.50
provides for a right of civil action against anyone who commits a crime of child stealing, defined in the statute to include Interference with Custody. The statute, however, expressly denies such a right between parents of a child. See R.C. 2307(D). InBrown, we remarked that:
 R.C. 2307.50(D) is evidently in recognition of the fact that as between parents a domestic relations court is in a position to deal with violations of its visitation orders through the exercise of its contempt powers. This would ordinarily be preferable to involving another court in the matter, and it is understandable therefore that the General Assembly wished to make it clear that there would be no independent civil action, cognizable in another court, in such a situation.
In denying the possibility of such a civil action, the General Assembly apparently feared that such a right would "encourage a multitude of claims for petty infractions." SeeBrown, 72 Ohio App.3d at 424 (Wilson, J., concurring).
That danger also exists, to some extent, with application of the criminal statute to visitation infractions. Given the bitterness of many custody disputes, it is not out of the question that one parent may use even the most minor overstepping by the other as an opportunity to cast the latter as a criminal. Nevertheless, while the general assembly has created an express exception for parents in regard to civil liability, no such express exception was created in the criminal statute. Indeed, R.C. 2307.50(D) appears to contemplate the possibility that parents may face criminal charges under R.C. 2919.23, because, if it were not so, no exception from civil liability would be needed.
We recognize that a criminal sanction is a rather blunt instrument for dealing with the myriad conflicts and minor violations that can occur in the context of custody and visitation. In all but the most extraordinary situations, a contempt action in a domestic relations court is the preferable means of enforcing a visitation order. Nevertheless, a plain reading of the statute does not exclude parents with visitation from its reach, and we are not inclined to read such an exception into the statute if the legislature chose not to do so.
For the most part, it appears that persons convicted of R.C.2919.23(A)(1), since the statute was enacted in 1974, have been third parties who took or kept minor children from their parents. See, e.g., State v. Kinney, (1982), 7 Ohio App.3d 243; State v.Feineigle (Oct. 9, 1997), Hancock App. No. 5-97-11, unreported;State v. Harris (Oct. 26 1983), Hamilton App. No. C-820973. Nevertheless, parents have on occasion been criminally charged under R.C. 2919.23. See, e.g., State v. Skelly (Dec. 7, 1992), Montgomery App. No. 13306, unreported; State v. Francis (May 4, 1994), Summit App. No. 16351, unreported (a particularly egregious case involving charges of corrupting a minor with drugs, sexual battery, and forced prostitution).
In State v. Skelly, this appellate court affirmed the conviction of a mother who interfered with the custody of several children in the custody of their father. See Skelly, supra. An order of the domestic relations court had prohibited her from having any contact with her children at all until a visitation order was entered. We held that the domestic relations order was relevant evidence of whether the mother knew that she was "without privilege" to interfere with custody of the children. Id. at 3. In light of that fact, we upheld her conviction. Id. at 5.
In Skelly, the mother had no visitation rights. Brickles argues for an exception based on his status as a parent with visitation rights. Our research has, in fact, discovered no case among the reported cases or among the unreported appellate cases where the criminal sanction of the statute was applied to such a parent. To that extent, then, this is a case of first impression. Nevertheless, we are unable to draw a principled exception to the statute based solely on the existence of visitation rights. Both in Skelly and in the instant case, the parent's natural privileges regarding custody were limited by court order. In other contexts, we have recognized that the privileges granted by a visitation order are not general, but are specific to the times granted by the order. See State v. Hirtzinger (1997), 124 Ohio App.3d 40,45.
Finally, we note that the General Assembly has abolished the crime of Child Stealing, formerly R.C. 2905.04, apparently merging it into the crime of Kidnaping. Am.Sub.S.B. No. 2. Although it does not appear that parents with visitation rights are often charged with interference with custody, they could be, and have been, charged under the Child Stealing statute. See State v.Kimbler, 31 Ohio App.3d 147, 151. A parent that purposefully withheld his child from the legal custody of the other parent could be found guilty of Child Stealing even if contempt proceedings were available to punish the same activity. See id.
at 151-152.
Now that the Child Stealing statute has been repealed, R.C.2919.23 is the only criminal law remedy, permitting police intervention, for activities short of kidnaping that interfere with parental custody. We think it unlikely that the General Assembly would have acted so if they did not intend R.C. 2919.23
to cover many of the same situations that were formerly prosecuted under R.C. 2905.04.
In light of the foregoing, we conclude that a parent with visitation rights under court order can be charged with violation of R.C. 2919.23 if he keeps his child without privilege to do so.
 B
Having decided that Mr. Brickles, as a parent with visitation rights, could be charged under R.C. 2919.23 for Interference with Custody, we must now consider whether his conviction was consistent with the manifest weight of evidence. There is no significant dispute that Brickles kept his daughter from her mother, bringing his conduct within the scope of the statute. The only real issue is whether he had the proper mens rea: "knowing" that he was "without privilege to do so or being reckless in that regard." R.C. 2919.23.
The Supreme Court has instructed that review of the sufficiency and weight of evidence are independent functions of an appellate court each having its own standard of analysis. Statev. Thompkins (1997), 78 Ohio St.3d 380, 386-387. Review of the manifest weight of evidence is the broader inquiry. Id. When reviewing sufficiency we are required to view the evidence in a light most favorable to the prosecution and then inquire whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus. In contrast, when reviewing the weight of evidence, we must consider "the inclination of the greater amount of credible evidence."Thompkins, 78 Ohio St.3d at 386, citing Black's Law Dictionary (6 Ed. 1990) 1433. An appeals court reviewing the weight of evidence sits as a kind of "thirteenth juror" and may act upon a disagreement with a determination of the fact-finder. Id. at 388. The Thompkins Court adopted the following as the proper standard of review for weight of evidence:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
 Id. at 380, quoting State v. Martin (1983), 20 Ohio App.3d 172,175. Thus, the Thompkins decision cautions us to show deference to the fact-finder and reverse on manifest weight review only in extraordinary cases.
There was conflicting testimony at trial regarding whether Roger Brickles knew he lacked privilege to keep his daughter past 6:00 p.m. on Sunday, April 19, 1998. On the one hand, in his defense, he had the testimony of several witnesses who reported that he had a note drafted asserting custody rights for the seven days from April 17 until April 24. Those same witnesses testified that he delivered copies of that note to his former spouse, by regular mail and by personally delivering a note to her mailbox. Then, he kept a photocopy of that note which he showed to police on April 19.
On the other hand, there was the testimony of Michelle Brickles. She reported that she never received any letter regarding visitation in April. She also testified that she told him, as he was leaving Friday night, that she would see him on Sunday at 6:00, and he said nothing in reply. (Tr. 11.) Michelle Brickles was forced to recant this latter testimony, however, when confronted with the statement that she wrote as a complaining witness. The event is recorded in the transcript as follows:
 Q. All right Now, you had said that you had spoke to the defendant on Friday when he picked up on the 17th, all right? Do you remember what you had spoken to him about?
A. Only one thing.
Q. And what was that?
 A. I said goodbye to Tessa and I told David [the defendant], "Ill see you Sunday night at six o'clock."
Q. All right. And he didn't say anything back?
A. No, he did not.
Q. All right. He picked the child up from you?
A. Yes, he did.
 Q. Showing the [witness] what's marked as Plaintiff's Exhibit 2. This is your witness statement?
A. Yes, it is.
 Q. And you wrote this back around then the 18th, 19th, around then?
A. Yeah.
Q. Could you start reading from the top? Out loud?
 A. On Friday the 17th of April Mr. Brickles picked Tessa from my parents' home at 5:50. My mother Betty informed Mr. Brickles that Tessa should be dropped of at Tessa's home on Sunday the 19th at six.
Q. Keep going.
 A. He started to question my mother then said, I'll just have to call Michelle.
Q. Keep going.
 A. On Saturday the 18th I spoke to my mother for the first time since Tessa's departure with her father. That's when I was informed that he was — what he said the previous day.
 Q. All right. That's fine. So according to this was written about the time, Mr. Brickles did not pick Tessa up from you?
A. Yeah, he probably didn't.
Q. He probably didn't?
A. Yeah.
 Q. So when you said he picked her up from you, that he picked Tessa up from you, that probably wasn't right?
A. No.
Q. That statement was probably incorrect?
A. Yes, the statement —
 Q. And you said when you spoke to him on the 17th that probably wasn't correct either?
A. No —
Q. No. He spoke to your mom?
A. To my mom —
* * *
 Q. You didn't even know Roger had spoken to your mother until Saturday?
A. Right.
 Q. All right. So when you testified to all this under oath as to what happened on the 17th you weren't correct?
A. Its been several months ago.
 Q. Its been several months ago, but you seemed to testify like you knew what had happened.
[Prosecutor]: Objection to the characterization your Honor.
THE COURT: No, this is cross; I'll allow it.
THE WITNESS: Do what now?
* * *
 Q. When you testified you didn't seem as if you were questioning your memory; you seemed pretty confident as to what you testified about.
 A. There's a lot of times when sometimes he picks her up from me and sometimes he picks her up from my mom.
Q. And maybe your just crossing your memories a little?
A. Yeah, it happens all the time.
(Tr. 19-22.) Strangely, the appellee, in its brief to this court, makes much of the original account in which Roger Brickles was supposed to have said nothing when told to return Tessa on Sunday. The appellee suggests that this testimony is evidence that Roger Brickles knew he had no visitation privileges with his daughter after 6:00 on Sunday. That story, however, as is apparent from the excerpted material above, was completely discredited by the witness' own admission.
The impeachment of Michelle Brickles' testimony does more than undercut her account of the events of Friday, April 17. It seriously damages the credibility of her entire testimony. At best, it suggests that she had a faulty memory; at worst, it suggests that she was willing to make up facts that would incriminate her former spouse. Indeed, in the account of events in the written statement, Roger Brickles protested when he was told to return Tessa on Sunday. That is consistent with the defense's version of events in which Brickles believed he had a week's visitation scheduled with Tessa beginning on the 17th.
The Supreme Court has instructed that, when reviewing the weight of evidence, we should consider, among all the other factors underlying the judgment, the credibility of the witnesses. See Thompkins, 78 Ohio St.3d at 387; see also State v. Chandler
(July 31, 1998), Montgomery App. No. 16615, unreported, at 8. Given the inherent limitations of an appellate record in conveying the indicia of witness credibility, our review of such matters is greatly restrained. See id. Nevertheless, we do consider these matters, and the fact that a witness' testimony has been impeached is something that greatly affects our consideration.
Because the state had to prove mens rea beyond a reasonable doubt, we find it necessary to credit those witnesses who testified that Roger Brickles did send notification of his intent to exercise visitation after April 17. Even if Michelle Brickles never received any notice of the visitation, that would not prove that copies of the note were never sent. The defense case, however, shows significant corroboration, including a photocopy of the original note, testimony that the note was delivered, and the fact that Brickles asserted his right to keep Tessa consistently — when he picked her up on Friday, when Chief Bowman called him on the phone, and when police served him with the complaint.
In any event, the trial court's judgment does not appear to have been based on its assessment of the credibility of the witnesses. It appears, instead, that the trial court grounded its decision on the plain fact that, under the visitation order, Roger Brickles had no right to demand summer visitation in April. The basis of the court's judgment is made evident in the following exchange at the conclusion of the trial:
 [Defense counsel]: Thank you. No further questions.
THE COURT: Cross?
[Prosecutor]: No questions your Honor.
THE COURT: Thank you sir. You may step down.
[Defense Counsel]: Your Honor, defense rests.
 THE COURT: Based upon the evidence that I have heard I find the defendant guilty. Step forward please.
 Sir you have a contempt citation pending against you in the Common Pleas Court concerning these same issues?
THE DEFENDANT: No.
 [Defense Counsel]: No your Honor, the contempt citation — the contempt citation deals with the failure to return at the end of a weekend. Mr. Brickles (inaudible) is whether or not vacation notice was properly done.
 THE COURT: No, sir, that does not — that's not what we're here about. What we're here about is failure to return at the end of a visitation period. The month of April is not included in the summer.
[Prosecutor]: Your Honor —
THE COURT: Very simply.
 Thus, it appears that the trial court found Brickles guilty because he clearly had no custody rights after 6:00 p.m on Sunday, April 19.
Certainly, no objectively reasonable interpretation of the visitation agreement would have given Roger Brickles the right to demand a week of visitation in April as "summer" visitation. Recklessness is the less stringent standard of culpability for the state to prove. See R.C. 2901.22(E). The Revised Code defines recklessness in the following terms:
 A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
 2901.22(C).
Although the defendant may have reasonably believed that his former wife did not object to his exercising "summer visitation" in April when she did not respond to the mailbox note, her subsequent conduct in calling the police left no doubt she expected the standard order of visitation to be followed by him.
The defendant's obstinate refusal to return his daughter after he spoke with Chief Bowman could certainly be characterized as the "recklessness" envisioned by R.C. 2901.22(E). We therefore, cannot say that the trial judge in this case clearly lost its way and created a manifest miscarriage of justice in concluding that the defendant was guilty of interfering with custody pursuant to R.C. 2919.23(A)(1). The appellant's assignment of error is overruled.
The judgment of the trial court is Affirmed. GRADY, P. J., and FAIN, J., concur.
Copies mailed to:
Gregory P. Spears, Kevin E. Vance, Hon. James L. Manning